**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SCOTTIE J. D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:23CV695 |
| | ) | |
| MARTIN J. O'MALLEY, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Scottie J. D., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 10 (Plaintiff's Brief); Docket Entry 11 (Commissioner's Brief); see also Docket Entry 12 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for the Commissioner.

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.   PROCEDURAL HISTORY

Plaintiff applied for SSI on June 11, 2020 (Tr. 279-89), alleging a disability onset date of September 1, 2014 (<u>see</u> Tr. 48, 281), which he later amended to his application date of June 11, 2020 (<u>see</u> Tr. 294).  Upon denial of that application initially (Tr. 117-32, 142-45) and on reconsideration (Tr. 133-41, 155-57), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 158-60).  Plaintiff, his attorney, a medical expert ("ME"), and a vocational expert ("VE") attended the hearing. (Tr. 69-116.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 45-68.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 276-78), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.   [Plaintiff] has not engaged in substantial gainful activity since June 11, 2020, the application date.

. . .

2.   [Plaintiff] has the following severe impairments: sleep apnea; obesity; mild facet hypertrophy at L5-S1, with mild bilateral sacroiliac joint degenerative changes; depression; and anxiety.

. . .

3.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

2

. . .

4.   . . . [Plaintiff] has the residual functional
capacity to perform less than the full range of light
work . . . .  He can lift/carry 20 pounds occasionally,
10 pounds frequently.  He can sit for six hours but would
need to alternate from sit to stand for 10-15 minutes
every two minutes of sitting, not away from the
workstation.  He could stand for 6 hours, alternating to
sitting for 10-15 minutes, after every 30 minutes of
standing.  He could walk for 6 hours, after every one
minute of standing.  He could push/pull as much as
lift/carry.  He could operate hand controls with the
right and left hand frequently.  He could frequently
reach overhead to the left and right.  He could handle
items frequently with the left and right hand.  He could
frequently finger with the right and left hand, and he
could frequently feel with the right and left hand.  He
could never climb ladders, ropes, [or] scaffolds.  He
could occasionally kneel, crouch, and crawl; and he could
frequently climb ramps/stairs, balance, and stoop.  He
could never work at unprotected heights or around moving
mechanical parts.  He could have frequent exposure to
humidity, wetness, dust, odors, fumes, and pulmonary
irritants, and occasional exposure to extreme heat and
vibration.  He could perform simple, routine, and
repetitive tasks, but not at a production rate pace
(e.g., assembly line work).  He could occasionally
interact with supervisors, coworkers, and the public.  He
could make simple work-related decisions, and his time
off tasks included the ability to perform simple,
routine, repetitive tasks.

. . .

5.   [Plaintiff] has no past relevant work.

. . .

9.   Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

> 10.  . . . [Plaintiff] has not been under a disability, as defined in the [] Act, since June 11, 2020, the date the application was filed.

(Tr. 50-60 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro

4

<u>v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]."  <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)."  <u>Id.</u> at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

5

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the

---

[2] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the
(continued...)

claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the

---

[3] (...continued)
[Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ did not properly incorporate the use of an assistive device when assessing [Plaintiff]'s RFC" (Docket Entry 10 at 13 (bold font and block formatting omitted); see also Docket Entry 12 at 1-4); and

2) "[t]he ALJ's evaluation of [consultative psychological examiner] Dr. [J. Craig] Hunt's medical opinions is legally deficient" (Docket Entry 10 at 21 (bold font omitted); see also Docket Entry 12 at 4-11).

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 11 at 5-24.)

### 1. Need for a Cane

In Plaintiff's first issue on review, he asserts that "[t]he ALJ did not properly incorporate the use of an assistive device when assessing [Plaintiff]'s RFC."  (Docket Entry 10 at 13 (bold font and block formatting omitted); see also Docket Entry 12 at 1-4.)  More specifically, Plaintiff maintains that the ALJ erred by 1) discounting Plaintiff's prescription for a cane because it "'was given to him at his own request'" (Docket Entry 10 at 15 (quoting Tr. 51)), and 2) by stating that "'the [ME] at the hearing testified that there was no medical necessity for a cane'" (id. (quoting Tr. 51)).  According to Plaintiff, "the ALJ's failure to properly account for [Plaintiff]'s medically necessary handheld assistive device was not harmless" (id. at 18), because "[t]he VE testified if a person needs a singlehanded assistive device to 'help in balance . . . in walking . . . in balance in raising and lowering himself . . . in standing . . . in climbing ramps and stairs . . . [and] when balancing and stooping' there would be no work" (id. at 19 (quoting Tr. 109)).  Those contentions lack merit.

"To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether

9

all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." Social Security Ruling 96-9p, <u>Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work</u>, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p"). (emphasis added). Moreover, "the legal issue does not turn on whether a cane was 'prescribed' . . . but whether a cane was 'medically required.'" <u>Spaulding v. Astrue</u>, 379 F. Appx 776, 780 (10th Cir. 2010).

The ME offered the following testimony in response to questions from the ALJ and Plaintiff's counsel regarding Plaintiff's need for a cane:

> [ALJ:]    From your review of the record, is there an indication of the necessity for a singlehanded assistive device?
>
> [ME:]    Nothing mentioned that I saw.
>
> ALJ:    Counsel, any questions?
>
> ATTY:    Yes, Your Honor. . . .    [W]ere you aware that . . . [Plaintiff] has been prescribed the use of a cane?
>
> [ME:] Well, in my notes I don't see it but with his obesity, it wouldn't surprise me.

(Tr. 81.)   The ALJ summarized that testimony as follows:

> [The ME] testified that it was mainly [Plaintiff's] obesity that would affect his standing/walking; however, there was nothing in the record to show anything significant, mostly showing mild impairment.   [The ME] testified that there was nothing in the record to show

10

> medical necessity for a cane; however, he testified that
> with [Plaintiff]'s obesity, it wouldn't surprise [the ME]
> that [Plaintiff] would need a cane.

(Tr. 54.)  The ALJ then provided the following explanation for his decision not to include the need for a cane in the RFC:

> There is mention in the record that [Plaintiff] uses a
> cane.  Records show that he asked his doctor to prescribe
> [Plaintiff] a cane, which [the doctor] did.  However,
> there is nothing to show that a physician found this
> medically necessary for [Plaintiff].  The [ME] testified
> that it would be reasonable for [Plaintiff] to want a
> cane due to his excessive weight, which exacerbates his
> back and knee issues.

(Tr. 59.)  The ALJ did not err in declining to find Plaintiff's cane medically necessary (see id.) because, for the reasons discussed more fully below, Plaintiff has failed to produce "medical documentation" of his "need for a [cane]" and "the circumstances for which it is needed," SSR 96-9p, 1996 WL 374185, at *7.

Plaintiff first faults the ALJ for discounting Plaintiff's "'prescription for [a] cane in the record,'" because the prescription "'was given to him at his own request for a cane.'" (Docket Entry 10 at 15 (quoting Tr. 51).)  In Plaintiff's view, his treating physician, Dr. Carly Marie Faller, "was under no obligation to provide a prescription for durable medical equipment she believed was unwarranted or unnecessary," and thus "a reasonable inference is that Dr. Faller believed it was necessary." (Id. (referencing Tr. 1114).)  Moreover, Plaintiff points out that "Dr. Faller did not list an end date or time for when the cane

11

would no longer be prescribed" (id. at 16 (citing Tr. 1114)), Plaintiff "testified he use[d] the cane for walking unless he c[ould] hold on to something" (id. (citing Tr. 85, 101)), and "[t]he record indicated [Plaintiff] used a single point can [sic] while walking" (id. (citing Tr. 18, 26, 597, 618, 620, 1088)). That argument falls short for three reasons.

First, Dr. Faller's order for a cane (see Tr. 1114), issued in direct response to Plaintiff's specific request for a cane (see Tr. 601-02), does not, standing alone, constitute "medical documentation establishing the need for a hand-held assistive device," SSR 96-9p, 1996 WL 374185, at *7 (emphasis added). Dr. Faller did not conduct an examination of Plaintiff in connection with her order for a cane (let alone document lower extremity functional limitations warranting a cane) (see Tr. 601-02, 1114), offer an opinion that the cane qualified as medically necessary (see Tr. 1114), or provide any statement "describing the circumstances for which it is needed," SSR 96-9p, 1996 WL 374185, at *7 (emphasis added), (see id.). Given those facts, no inference of medical necessity arises from Dr. Faller's mere prescription, at Plaintiff's request, for a cane. See Michael T. v. Commissioner of Soc. Sec., No. 2:22CV2148, 2023 WL 2140984, at *5 (S.D. Ohio Feb. 21, 2023) (unpublished) ("[The p]laintiff has failed to show that the mere existence of a prescription for a cane (written at [the p]laintiff's request), without more, is sufficient in this case to

12

establish that his cane is medically necessary.  Instead, the ALJ reasonably discounted [the p]laintiff's subjective report that he needed a cane after discussing all of the relevant evidence, including the fact that examining physicians consistently noted normal gait both before and after [the p]laintiff obtained his cane prescription."); Jonathan F. v. Kijakazi, No. CV 21-7612, 2022 WL 17362996, at *4 (C.D. Cal. Nov. 30, 2022) (unpublished) ("In finding that [the p]laintiff's use of a cane was not medically supported, the ALJ relied on evidence . . . that [the p]laintiff requested a cane as opposed to being prescribed one. . . . [The p]laintiff does not cite to anywhere in the record that establishes the need for a cane and describes the circumstances for which it is needed."); Anusionwu v. Commissioner of Soc. Sec., No. 3:20CV758, 2022 WL 3536389, at *3 (S.D. Miss. June 6, 2022) (unpublished) ("The [court] has not found anything in the record establishing that [the p]laintiff's use of a cane is medically necessary or required.  [The p]laintiff points to no evidence in the record that . . . a medical professional suggested that [the p]laintiff use a cane.  As the record stands, it appears that [the p]laintiff simply requested a cane and was provided one with no finding that the device was medically necessary."), recommendation adopted, 2022 WL 3499638 (S.D. Miss. Aug. 17, 2022) (unpublished); Peake v. Berryhill, No. 5:17CV1998, 2018 WL 1178256, at *16 (S.D.W. Va. Feb. 8, 2018) (unpublished) ("[W]hen [a physician] wrote the note

13

regarding [the plaintiff]'s request for a cane, [the physician] did not provide any reason for the prescription, other than [the plaintiff]'s desire to have a cane. The records do not reflect an examination by [the physician] to evaluate [the plaintiff]'s need for an ambulatory assistive device, and [the physician] did not provide any details or instructions about when, where, and for how long [the plaintiff] might need to use the cane."), recommendation adopted, 2018 WL 1177354 (S.D.W. Va. Mar. 6, 2018) (unpublished); Easley v. Commissioner of Soc. Sec., No. 1:11CV64, 2012 WL 32351, at *13 (S.D. Ohio Jan. 5, 2012) (unpublished) (holding that "the record d[id] not support [the state agency medical consultant]'s interpretation of [the primary care physician]'s treatment notes" as reflecting a medically required cane, because those notes "clearly indicate[d] that . . . [the] plaintiff requested a cane, not that it was deemed medically necessary"), recommendation adopted, 2012 WL 910015 (S.D. Ohio Mar. 16, 2012) (unpublished).

Second, Plaintiff's reliance on his own "testi[mony that] he use[d] the cane for walking unless he c[ould] hold on to something" (Docket Entry 10 at 16 (citing Tr. 85, 101)) misses the mark. Plaintiff's subjective testimony that he "got a cane [for] walking" because his "legs and feet be [sic] swollen all the time" (Tr. 85), and that he "ha[d] to use [his] cane to walk" (Tr. 101) does not constitute "medical documentation" sufficient to establish the medical necessity of his cane, SSR 96-9p, 1996 WL 374185, at *7.

14

See Hale v. Kijakazi, No. 1:20CV277, 2021 WL 3625319, at *2 (W.D.N.C. Aug. 16, 2021) (unpublished) (holding that "[s]ubjective claims . . . are insufficient" to establish medical documentation of cane necessity required by SSR 96-9p (internal quotation marks omitted)); Morrison v. Saul, No. 3:20CV223, 2021 WL 795190, at *4 (W.D.N.C. Mar. 2, 2021) (unpublished) ("[The plaintiff] offers no medical evidence regarding his cane or the circumstances he needs it for. Instead, he offers his own lay testimony and cites examination findings regarding his lower extremities. But that evidence merely describes [his] symptoms — it does not provide medical documentation establishing that [he] needed the cane . . . ." (internal parenthetical citations omitted)); Thomas H. v. Berryhill, No. 4:17CV41, 2018 WL 10806837, at *8 (W.D. Va. Aug. 27, 2018) (unpublished) ("[The plaintiff]'s subjective belief that he needs a cane to walk and for stability due to muscle atrophy in the right leg and pain in his legs and hips is not acceptable 'medical documentation' that could establish his underlying medical need to use a cane to aid in walking or standing." (quoting SSR 96-9p, 1996 WL 374185, at *7) (some internal quotation marks and citations omitted)).

Third, Plaintiff's assertion that "[t]he record indicated [he] used a single point can [sic] while walking" (Docket Entry 10 at 16 (citing Tr. 18, 26, 597, 618, 620, 1088)) conflates his mere use of a cane with the medical necessity of such a device. See Morrison,

15

2021 WL 795190, at *4 (rejecting the plaintiff's argument that ALJ erred by failing to include cane in RFC, "because no provider ever stated that [the plaintiff] needed the cane, only that he sometimes presented with one"); Thomas H., 2018 WL 10806837, at *8 ("The mere fact that [the plaintiff] sometimes presented to clinic appointments with a cane [] does not establish his underlying medical need to use that device. *Cf. Craig*, 76 F.3d at 590 n.2 ('There is nothing objective about a doctor saying, without more, "I observed my patient telling me she was in pain."').").

Furthermore, most of the record citations upon which Plaintiff relies to support his assertion that he used a cane for ambulation during the relevant period do not, in fact, support that assertion. (See Docket Entry 10 at 16 (citing Tr. 18, 26, 597, 618, 620, 1088).) Transcript pages 18 and 26 consist of treatment notes from Dr. Faller dated February 23, 2023 (see Tr. 18), and Dr. Brandon L. Williams dated January 27, 2023 (see Tr. 26), which post-date the ALJ's decision (see Tr. 45 (reflecting decision date of December 9, 2022)), and which Plaintiff submitted to the Appeals Council (see Tr. 2). In turn, the Appeals Council expressly found that those records "d[id] not relate to the period [before the ALJ]" and "d[id] not affect the decision about whether [Plaintiff] w[as] disabled beginning on or before December 9, 2022" (id. (emphasis added)), the date of the ALJ's decision (see Tr. 45). Transcript pages 618 and 620 merely reflect Plaintiff's requests for a cane

16

from his providers on May 24, 2021 (see Tr. 618), and March 11, 2021 (see Tr. 620), and fail to reflect that he even obtained a cane on those occasions, let alone that he used a cane for walking (see Tr. 618, 620).

Moreover, although transcript page 597 shows that Plaintiff presented with a cane to his initial physical therapy evaluation on December 16, 2021, seven days after Dr. Faller entered her order for the cane (see Tr. 1114), and transcript page 1088 reflects that Plaintiff appeared with a cane at Dr. Hunt's consultative psychological examination on August 31, 2022 (see Tr. 1088), many other records contain no indication Plaintiff used a cane (see Tr. 374 (Plaintiff's Function Report dated March 3, 2021, not listing cane in response to question asking about use of medical aids),[6] 542-44 (physician visit on November 13, 2020), 547-50 (emergency room visit on October 26, 2020), 1097-1100 (emergency room treatment on August 30, 2022), 1102-03 (primary care visit on September 22, 2022), 1104-08 (podiatry treatment on October 17, 2022), 1109-11 (office visit with Dr. Faller on November 17, 2022)), expressly state he did not use a cane (see Tr. 519 (consultative medical examination by Dr. Stephen Burgess on October 12, 2020), 1037 (physical therapy session dated January 12, 2022), 1040 (physical therapy appointment on January 14, 2022)), or

_____

[6] A previous Function Report completed by Plaintiff on August 6, 2020, reflects only that Plaintiff used a friend's cane "sometimes walking when [his] legs and feet [we]re swollen." (Tr. 341 (emphasis added).)

17

documented that Plaintiff walked on a regular basis without mention of a cane (see Tr. 584 (primary care visit on January 29, 2021, reflecting that Plaintiff "walk[ed] a decent amount"), 605 (treatment with Dr. Faller dated November 11, 2021, recording that Plaintiff "walk[ed] every day as tolerated" and "walk[ed] his niece to and from school Monday through Friday"), 613 (visit with Dr. Faller on September 14, 2021, documenting that Plaintiff "walk[ed] every day as tolerated")). Accordingly, Plaintiff has not shown that "[t]he record indicated [he] used a single point can [sic] while walking." (Docket Entry 10 at 16.)

Next, Plaintiff contends that the ALJ erred by stating that "'the [ME] at the hearing testified that there was no medical necessity for a cane.'" (Docket Entry 10 at 15 (quoting Tr. 51); see also Docket Entry 12 at 3 (characterizing that statement by ALJ as "material misrepresentation of [the ME]'s testimony")．) In support of that argument, Plaintiff argues as follows:

> Due to [Plaintiff]'s "monumental obesity" he would have limitations standing and walking according to [the ME]. And while [the ME] did not see [Plaintiff]'s cane prescription "in [his] notes" it would not "surprise" him that [Plaintiff] needed a cane due to his obesity. The ALJ found [the ME]'s opinion "persuasive." . . .
>
> The ALJ declared "the [ME] at the hearing testified that there was no medical necessity for a cane." That is not what the [ME] said. The ALJ asked "[f]rom your review of the record, is there an *indication* of the necessity for a singlehanded assistive device[.]" The [ME] stated "[n]othing mentioned that I saw." But [the ME] did not say the cane was not medically necessary. [The ME]'s testimony when taken as a *whole* supports the medical necessity of the cane due to [Plaintiff]'s obesity.

18

(Docket Entry 12 at 4 (quoting Tr. 51, 59, 80, 81) (italics supplied by Plaintiff) (internal citations omitted).)

Plaintiff's argument fails because it relies on an unreasonable interpretation of the colloquy between the ALJ and the ME. Although Plaintiff's argument lacks clarity, he appears to interpret the ALJ's question to the ME whether "an <u>indication</u> of the necessity for a singlehanded assistive device" existed in the record (Tr. 81 (emphasis added)) as merely a request for the ME to identify whether the record contained any opinions regarding the medical necessity of a cane. (<u>See</u> Docket Entry 10 at 17-18; <u>see also</u> Docket Entry 12 at 3-4.) That interpretation does not make sense, as the ALJ did not need the services of an expert to tell the ALJ whether any of Plaintiff's providers of record offered an opinion regarding a cane's medical necessity. More reasonably interpreted, the ALJ intended to ask the ME whether any of the evidence that he reviewed led him to conclude that Plaintiff's cane qualified as medical necessary. The ME's response "[n]othing mentioned that I saw" (Tr. 81) confirms that the record material he reviewed did not contain any evidence indicating that Plaintiff's cane qualified as medically necessary. That interpretation further harmonizes with the ME's earlier opinion that Plaintiff's obesity caused only <u>mild</u> limitations on his abilities to stand and walk. (<u>See</u> Tr. 80-81.) Moreover, the ME's later statement that Plaintiff's prescription for a cane did not "surprise" the ME in

19

light of Plaintiff's "obesity" does not equate to an opinion that the cane qualified as <u>medically necessary</u>.

Put simply, the ALJ did not err by declining to include the need for a cane in the RFC, and, thus, Plaintiff's first issue on review fails as a matter of law.

### 2. Dr. Hunt's Opinions

Plaintiff's second and final assignment of error asserts that "[t]he ALJ's evaluation of Dr. Hunt's medical opinions is legally deficient." (Docket Entry 10 at 21 (bold font omitted); <u>see also</u> Docket Entry 12 at 4-11.)  In particular, Plaintiff attacks the ALJ's decision to find Dr. Hunt's opinions "not persuasive" (Tr. 59) as "'supported heavily on [Plaintiff]'s own subjective reports of his symptoms and limitations'" (Docket Entry 10 at 21 (quoting Tr. 58)), and as "'not consistent with the totality of the evidence pertaining to his mental health, which supports no more than moderate limitations'" (<u>id.</u> (quoting Tr. 58-59)).  According to Plaintiff, the ALJ's "error was not harmless," because "[t]he VE testified that someone who could have no contact with the general public and coworkers and only occasional contact with supervisors . . . [and] was unable to tolerate normal work stressors would be precluded from work." (<u>Id.</u> at 24 (citing Tr. 112-15).)  For the reasons that follow, Plaintiff's contentions do not establish a basis for remand.

20

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 279-89)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence, see Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions and prior administrative medical findings or accord special deference to treating source opinions. See 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[7] Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5).

21

in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R. § 416.920c(b)(2).[8] The ALJ must only address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. § 416.920c(c)(3)-(5) — when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 416.920c(b)(3).

On August 31, 2022, Dr. Hunt conducted a consultative psychological examination of Plaintiff (Tr. 1087-93), during which Plaintiff reported that he did not "like to hang in crowds," his mental functioning "varie[d]" and "[s]ome m[ight] call it mood swings," he had "a lot of issues [he was] dealin[g] with,"

---

[8] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; <u>see also</u> 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; <u>see also</u> 20 C.F.R. § 416.920c(c)(2).

"[s]ometimes [he] might get caught talking to himself," and he did not "try to hold conversations with others" (Tr. 1088). Plaintiff additionally complained of "difficulty maintaining sleep, chronic depressed mood, difficulty experiencing pleasure, occasional crying episodes, occasional fatigue, and social withdrawal." (Tr. 1089.) During the mental status examination, Dr. Hunt noted that Plaintiff appeared "alert[, ] demonstrated contact with reality," and "presented with a serious demeanor" (Tr. 1088), and found Plaintiff's speech and thought process/content normal (see Tr. 1089). Dr. Hunt documented "mildly restricted" affect (id.), "[w]ithin [n]ormal [l]imits [('WNL')] to [m]arginal" immediate retention/recall (id.), "[WNL] to [m]arginal" recent memory (id.), and "[b]elow [e]xpectations" fund of information (Tr. 1089-90), but "[WNL]" remote memory (Tr. 1089), "[WNL]" ability to perform calculations (Tr. 1090), "[WNL]" ability to engage in abstract thinking (id.), and "[WNL]" judgment (id.). Additionally, Dr. Hunt noted that Plaintiff "demonstrated awareness of his concerns[, but ] tended to focus on the physical complaints," and "estimate[d Plaintiff's] intellectual functioning [] in the low average range." (Id.) Dr. Hunt diagnosed "[u]nspecified [d]epressive [d]isorder" and "[u]nspecified [p]ersonality [d]isorder - cluster B traits." (Id.)

Following the examination findings, Dr. Hunt provided the following opinions:

> [Plaintiff] appears to have the intellectual capacity to perform simple, routine, repetitive tasks as well as understand and follow instructions but could have mild to moderate difficulty with retention based on his presentation and mental status response. Psychiatric symptoms could cause moderate complications for all the aforementioned. Sustained performance of the previous is uncertain given his physical complaints. He demonstrated marginal interpersonal behavior and could have moderate to marked difficulty interacting effectively with peers, coworkers, and supervisors due to complications from mood and entrenched interpersonal style. He demonstrated adequate to marginal concentration, persistence, and pace based on his mental status response. He could have moderate to marked difficulty tolerating the stress associated with day-to-day work activity due to the depletion of coping resources related to chronic illness as well as underdeveloped coping resources and dysfunctional coping resources related to engrained personality features. He appears to have the cognitive capacity to allow for conforming to social standards and complying with rules and regulations, as well as[] cooperating with authority figures but his history suggests some disruptions. His prognosis is guarded. . . . [He] appears capable to manage funds based on his overall cognitive abilities and mental status.

(Tr. 1091.) Dr. Hunt also completed a Medical Source Statement on which he opined that Plaintiff would have <u>no</u> difficulty handling simple instructions and making simple work-related decisions, and would have moderate difficulties handling complex instructions and making complex work-related decisions. (<u>See</u> Tr. 1092.) Dr. Hunt further indicated that Plaintiff would have marked difficulty interacting appropriately with the public, moderate difficulty interacting with supervisors and co-workers, and moderate difficulty responding appropriately to usual work situations and routine changes, as well as that Plaintiff's mental impairments did

24

not affect his abilities to maintain concentration, persistence, or pace or to adapt and manage himself.  (See Tr. 1093.)

After accurately summarizing Dr. Hunt's above-quoted opinions, the ALJ found them "not persuasive" (Tr. 59), as "supported heavily on [Plaintiff]'s own subjective reports of his symptoms and limitations" (Tr. 58) and as "not consistent with the totality of the evidence pertaining to his mental health, which supports no more than moderate limitations" (Tr. 58-59).  Plaintiff contests both of the ALJ's rationales for discounting Dr. Hunt's opinions, but neither of Plaintiff's critiques carry the day.

First, Plaintiff challenges the ALJ's statement that Dr. Hunt's opinions relied "heavily on [Plaintiff]'s own subjective reports of his symptoms and limitations" (Tr. 58), arguing that "[t]here is no evidence Dr. Hunt did not rely on his professional, interpretive judgment and expertise in making his determinations" (Docket Entry 10 at 21; see also id. at 21-22 (quoting Matthews v. Barnhart, 347 F. Supp. 2d 1093, 1101-02 (M.D. Ala. 2003), for proposition that "[c]linical psychologists deal with quintessentially subjective information with respect to which they must exercise interpretive judgment"), 22 (quoting Aurand v. Colvin, 654 F. App'x 831, 837 (7th Cir. 2016), for proposition that "a psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning; there is no blood test for bipolar disorder")).  According to Plaintiff, Dr. Hunt

based his opinion that Plaintiff "'could have moderate to marked difficulty interacting with [others]'" (Docket Entry 12 at 10 (quoting Tr. 1091)) on Plaintiff's "'cognitive ability and overall mental status'" (id. (quoting Tr. 1090)), as well as "a detailed history of difficulties with 'interpersonal relationships,' 'legal complications,' 'academic performance,' [ an] 'extended history of homelessness[,] and a limited support system'" (id. at 10-11 (quoting Tr. 1091)).

Although Dr. Hunt indeed indicated that he based his opinions on Plaintiff's "cognitive ability and overall mental status" (Tr. 1090), the mental status examination's largely normal findings do not support Dr. Hunt's moderate to marked limitations (see Tr. 1088-90). As discussed above, Dr. Hunt's mental status examination recorded normal speech (see Tr. 1089), thought process/content (see id.), memory (see id.), abstraction (see Tr. 1090), calculations (see id.), judgment (see id.), and insight (see id.), along with a "mildly restricted" affect (Tr. 1089) and "intellectual functioning [] in the low average range" (Tr. 1090), with only Plaintiff's fund of information appearing "[b]elow [e]xpectations" (Tr. 1089-90; see also Tr. 1091 ("[Plaintiff] had notable difficulty with fund of information but other aspects of cognitive functioning assessed within the mental status examination appear within normal limits." (emphasis added)). Those normal objective findings, along with Dr. Hunt's observations of Plaintiff as "alert," "adequate[ly]

26

motivat[ed]," "sufficient[ly] responsive[]," and "without visible signs of discomfort throughout the examination process" (Tr. 1088) do not support Dr. Hunt's opinions that Plaintiff "demonstrated marginal interpersonal behavior," "could have moderate to marked difficulty interacting effectively with [others]" and "could have moderate to marked difficulty tolerating the stress associated with day-to-day work activity" (Tr. 1091 (emphasis added)), which, in turn, supports the ALJ's finding that Dr. Hunt over-relied on Plaintiff's subjective symptom reporting (see Tr. 58). See Fedornak v. Commissioner of Soc. Sec., No. 8:20CV416, 2021 WL 397353, at *5 (M.D. Fla. Jan. 19, 2021) (unpublished) (classifying "mental status examinations" as "form of objective evidence" and holding that, "[w]hile psychological diagnoses will depend in part on the subjective allegations by the patient, there is no precedent for relying solely on a patient's self-reporting of psychological limitations" (emphasis added)), recommendation adopted, 2021 WL 391268 (M.D. Fla. Feb. 4, 2021) (unpublished).

Consistent with the lack of objective findings supporting Dr. Hunt's opinions, Dr. Hunt's report makes clear he relied heavily on Plaintiff's subjective statements. For example, Dr. Hunt noted that Plaintiff "described long-term difficulty in interpersonal relationships" (Tr. 1091 (emphasis added)), "reported he does not socialize" (Tr. 1088 (emphasis added)), "gave [a] history of interpersonal difficulty and emotional functioning consistent

27

w[ith] aspects of cluster B personality disorders" (Tr. 1093 (emphasis added)), and "<u>acknowledged</u> history of legal complications but stated he did not wish to provide further information" (Tr. 1091 (emphasis added)).[9] Under such circumstances, the ALJ did not err by discounting Dr. Hunt's opinions, in part, because they over-relied on Plaintiff's subjective reports. See <u>Miller v. Kijakazi</u>, No. 1:21CV97, 2022 WL 1004582, at *10 (M.D.N.C. Apr. 4, 2022) (unpublished) ("[The consultative psychological examiner] found [the p]laintiff pleasant, friendly and open, with rapport easily established, and eye contact established and maintained and thus [the examiner] based his statement that [the p]laintiff had a history of not getting along with his fellow workers and supervisors and reported he was easily angered and tended to argue on [the p]laintiff's subjective statements rather than any objective findings. Similarly, [the examiner] did not make any observations on mental status examination of anxiety, jumpiness, panic symptoms, or PTSD symptoms and thus his statement that [the p]laintiff continued to have some symptoms of PTSD and anxiety and suffer from panic attacks that would result in moderate difficulty

---

[9] Contrary to Plaintiff's representation that Dr. Hunt's examination contained "a <u>detailed history</u> of difficulties with 'interpersonal relationships[]' [and] 'legal complications,'" (Docket Entry 12 at 10 (emphasis added)), Dr. Hunt's report does not provide <u>any</u> description of Plaintiff's alleged history of <u>difficulties</u> with interpersonal relationships, such as anger issues or conflicts with others (<u>see</u> Tr. 1087-91), and, in fact, reflects that, because he did not have a fixed address, "[h]e stay[ed] with different <u>friends</u>" (Tr. 1088 (emphasis added)), as well as that he did not engage in social activities because he lacked <u>transportation, a phone, and money</u> (<u>see id.</u>). Moreover, Plaintiff refused to elaborate on his legal complications. (<u>See</u> Tr. 1088, 1090.)

in the ability to tolerate stress and pressure associated with day-to-day work activity again relied on [the p]laintiff's subjective reports rather than any objective findings. [ T]he ALJ did not err in discounting [the examiner]'s opinions based, in part, on his over-reliance on [the p]laintiff's subjective symptom reporting[.]" (internal quotation marks, parenthetical citations, some brackets, and ellipsis omitted)), recommendation adopted, slip op. (M.D.N.C. Apr. 20, 2022) (Schroeder, C.J.).[10]

---

[10] Plaintiff claims that the ALJ improperly substituted his own lay opinion for Dr. Hunt's expert opinion, because the ALJ 1) "d[id] not rely on the opinion of an acceptable medical source before reaching th[e] conclusion" that Dr. Hunt's "examination 'support[ed] . . . at least moderate limitations'" (Docket Entry 12 at 7 (quoting Tr. 58)), and 2) "interpret[ed] the raw medical data from Dr. Hunt's examination and then interpret[ed] that data without the benefit of the expertise of a medical expert" (id. at 9 (citing Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 108-09 (4th Cir. 2020), and Anderson v. Berryhill, No. 6:16CV3550, 2018 WL 1531558, at *2-3 (D.S.C. Mar. 29, 2018) (unpublished))). Neither of those arguments has merit. The ALJ found "not persuasive" (Tr. 58) the opinion of the state agency psychological consultant that Plaintiff's mental impairments qualified as non-severe (see Tr. 137), noting that the consultant's opinion "[wa]s not consistent with . . . [Dr. Hunt's] examination, which supports that [Plaintiff] does have a severe mental impairment, with at least moderate limitations" (Tr. 58 (emphasis added)). Thus, in formulating Plaintiff's mental RFC, "the ALJ struck a balance between the state agency [consultant]'s [non-severity finding] and the [moderate to marked] limitations opined by [Dr. Hunt]," McNeill v. Berryhill, No. 1:16CV1081, 2017 WL 1184187, at *10 (M.D.N.C. Mar. 29, 2017) (unpublished), recommendation adopted, slip op. (M.D.N.C. Apr. 24, 2017) (Eagles, J.), and "was not required to obtain an expert medical opinion as to [Plaintiff]'s RFC," Felton-Miller v. Astrue, 459 F. App'x 226, 231 (4th Cir. 2011); see also Wykle v. Saul, No. 1:19CV155, 2020 WL 697445, at *6 (W.D.N.C. Feb. 11, 2020) (unpublished) (holding that "there is no requirement that an ALJ base his RFC finding, or any particular limitation in it, on a medical opinion" (citing Felton-Miller, 459 F. App'x at 230-31)); compare Webster v. Colvin, No. 1:11CV101, 2014 WL 4060570, at *4-5 (M.D.N.C. Aug. 15, 2014) (unpublished) (Peake, M.J.) (remanding because ALJ "expressly interpreted the raw data from [the p]laintiff's treatment notes to discredit the opinions of the psychiatric consultants," who had offered "the only mental health opinions of record," but emphasizing that case did not involve "situation in which the record contain[ed] conflicting opinions; rather, the three opinions in question all include[d] work restrictions beyond those addressed by the ALJ"), recommendation adopted, slip op. (M.D.N.C. Sept. 17, 2014) (Osteen, Jr., C.J.). Moreover, the cases upon which Plaintiff relies to argue that the ALJ improperly "interpret[ed] the raw medical data from Dr. Hunt's examination" (Docket Entry 12 at 9 (citing Arakas and Anderson)) do not aid his cause. In each of those cases, the court found the ALJ impermissibly interpreted an MRI as documenting conditions (or the severity

(continued...)

29

Lastly, Plaintiff faults the ALJ for finding Dr. Hunt's opinions "not consistent with the totality of the evidence pertaining to his mental health, which supports no more than moderate limitations" (Tr. 58-59), but failing to provide an adequate explanation of that finding. (See Docket Entry 10 at 23-24 (citing Dowling v. Commissioner of Soc. Sec., 986 F.3d 377, 385 (4th Cir. 2021), and Pearson v. Commissioner of Soc. Sec., No. 1:20CV166, 2021 WL 3708047, at *5 (S.D. Miss. Aug. 11, 2021) (unpublished)).) In Plaintiff's view, "[c]ourts have routinely rejected ALJ's [sic] decisions that involve incomplete, cursory, or omitted evaluations of one of the two most important factors" in evaluating medical opinions, i.e., supportability and consistency. (Docket Entry 12 at 5 (citing, inter alia, Moore v. Kijakazi, No. 5:21CV4202, 2023 WL 2583225, at *4 (D.S.C. Mar. 21, 2023)

---

[10] (...continued)
of conditions) other than those reflected in the MRI. See Arakas, 983 F.3d at 108-09 (holding that, "[b]ecause the ALJ lacked the medical expertise to interpret a cervical MRI, he erred in discounting" physician's opinion that the plaintiff's "'cervical MRI showed clear evidence of chronic cervical spasm'" and "improperly substituted his own opinion" that "'an MRI would not document a chronic condition of spasm'"); Anderson, 2018 WL 1531558, at *3 ("[T]he MRI results do not contain any finding or impression that the imaging of [the p]laintiff's two disc bulges show 'only mild effects and no additional irregularities that would affect [her] abilities to such an extent that she could only work four hours per day' as stated by the ALJ. Without some expert interpretation of the evidence, the ALJ cannot read the MRI results or arrive at some conclusion about what they mean, either relative to other evidence or in regards to [the p]laintiff's limitations."). In contrast, here, the regulations required the ALJ to assess the supportability of Dr. Hunt's opinions, 20 C.F.R. § 416.920c(b)(2), which involves assessment of "[t]he extent to which [Dr. Hunt]'s opinion is supported by relevant objective medical evidence and [his] supporting explanation," Revisions to Rules, 82 Fed. Reg. at 5853 (emphasis added); see also 20 C.F.R. § 416.920c(c)(1). In concluding that Dr. Hunt's examination findings did not support his moderate to marked limitations (see Tr. 58-59), the ALJ did not improperly interpret "raw medical data," but, rather, followed the requirements of the regulations.

30

(unpublished), Singleton v. Kijakazi, No. 9:21CV3922, 2023 WL 1784656, at *8 (D.S.C. Jan. 10, 2023) (unpublished), recommendation adopted, 2023 WL 386824 (D.S.C. Jan. 25, 2023) (unpublished), and Boyd v. Kijakazi, No. 1:21CV29, 2022 WL 949904, at *3 (E.D. Va. Mar. 29, 2022) (unpublished)).)

As an initial matter, the facts in Singleton and Boyd distinguish those cases from the instant matter. In each of those cases, the ALJ failed to provide any analysis of the consistency of the opinion in question, see Singleton, 2023 WL 1784656, at *7 ("Notably absent from the ALJ's discussion is any consideration of the consistency factor, which the new regulations require. This was legal error." (emphasis added)); Boyd, 2022 WL 949904, at *3 ("[T]he problem here is that the ALJ did not actually analyze or even assert a bare conclusion as to whether the other record evidence was consistent with [the treating physician's] opinion." (emphasis added)), whereas the ALJ here expressly concluded that Dr. Hunt's "opinion [wa]s not consistent with the totality of the evidence pertaining to [Plaintiff's] mental health, which support[ed] no more than moderate limitations" (Tr. 58-59). Moreover, although the ALJ in Moore did provide a consistency finding by deeming a treating physician's opinions "unsupported by the weight of the evidence of record," Moore, 2023 WL 2583225, at *3, the court found that "the ALJ [] did not specifically connect

31

the record evidence she discussed elsewhere to [the treating physician]'s opinion," id. at *4.

In contrast to Moore, and considering the ALJ's decision as a whole, the Court can trace the path of the ALJ's reasoning in making his consistency finding.  See McCartney v. Apfel, 28 F. App'x 277, 279-80 (4th Cir. 2002) (rejecting challenge to ALJ's finding for lack of sufficient detail where other discussion in decision adequately supported finding and stating "that the ALJ need only review medical evidence once in his decision"); Flythe v. Berryhill, No. 1:17CV591, 2018 WL 4518690, at *6 (M.D.N.C. Sept. 20, 2018) (unpublished) ("[A]lthough the ALJ did not specify the objective evidence that failed to support [a treating physician]'s opinions in the same paragraph in which [the ALJ] weighed those opinions, elsewhere in the ALJ's decision, she detailed evidence that did not support [the treating physician]'s extreme limitations.  That approach suffices." (citing McCartney, 28 F. App'x at 279-80) (internal parenthetical citations omitted), recommendation adopted, No. 1:17CV591, 2019 WL 2336998 (M.D.N.C. June 3, 2019) (unpublished) (Tilley S.J.); Kiernan v. Astrue, No. 3:12CV459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (unpublished) (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of his analysis).

32

The ALJ noted Plaintiff's statement to Dr. Hunt that Plaintiff had never received inpatient mental health treatment and had only received outpatient mental health services <u>as a child</u> (Tr. 57 (referencing Tr. 1088); <u>see also</u> Tr. 1088 (denying that he had ever taken psychotropic medications)), and discussed the <u>sole</u> treatment visit in the record where Plaintiff "presented with complaints of depression" on January 29, 2021 (Tr. 57 (referencing Tr. 588)). The ALJ then made the following, additional observations regarding the medical evidence which support his finding that Dr. Hunt's opinions that Plaintiff had moderate to marked difficulty interacting with others and tolerating stress lacked consistency with the record:

- On Plaintiff's Function Report, he reported that "he g[ot] rides from <u>friends</u> to get out and get some fresh air" and "c[ould] <u>grocery shop</u>, but he r[ode] the scooter" (Tr. 52 (emphasis added) (referencing Tr. 371);

- Plaintiff testified that "he live[d] with a <u>friend</u> that has six kids, ages 2, 6, 7, 8, 13, [and] 14," that "he help[ed] care for them, but he c[ould ]not play with them because of his <u>back pain</u>" (Tr. 54 (emphasis added) (referencing Tr. 91-93)), and that a "<u>friend</u> brings [Plaintiff] food, or he goes [with a <u>friend</u>] to the food pantry" (<u>id.</u> (emphasis added) (referencing Tr. 90); and

- at primary care visits in October and November 2020, Plaintiff's "affect and mood were normal" (Tr. 56 (referencing Tr. 543, 549); <u>see also</u> Tr. 607 (same - Nov. 11, 2021), 615 (same - Sept. 14, 2021), 1044 (same - Jan. 18, 2022), 1099 (same - Aug. 30, 2022), 1102 (same - Sept. 22, 2022), 1106 (same - October 17, 2022)).

33

That evidence, discussed by the ALJ prior to his evaluation of Dr. Hunt's opinions, helps elucidate the ALJ's reasoning in finding those opinions "not consistent with the totality of the evidence pertaining to [Plaintiff's] mental health" (Tr. 58-59).[11]

Plaintiff disputes the Court's ability to read the ALJ's decision as a whole to ascertain whether he sufficiently supported his finding that Dr. Hunt's opinions lacked consistency with the record. (See Docket Entry 12 at 5.) In that regard, Plaintiff argues that <u>Smith v. Astrue</u>, 457 F. App'x 326 (4th Cir. 2011), and <u>McCartney</u> both "involved an ALJ decision where the ALJ thoroughly evaluated the evidence at step four [of the SEP], but not at step three" (<u>id.</u> (citing <u>Smith</u>, 457 F. App'x at 328, and <u>McCartney</u>, 28 F. App'x at 279)), and that "[t]he new regulations [governing evaluation of medical opinions] do not contemplate a 'record as a whole' evaluation" (<u>id.</u> (citing 20 C.F.R. § 416.920c(b)(2))).

A neighboring district court recently and persuasively rejected a similar argument:

> [The p]laintiff argues that [<u>McCartney</u> and <u>Kiernan</u>] are distinguishable from the present matter since they concerned objections to step three of the [SEP], rather than objections to the ALJ's obligation to analyze the persuasiveness of an opinion in step four. . . . The [c]ourt disagrees. While it is true that the plaintiffs in <u>McCartney</u> and <u>Kiernan</u> challenged each respective ALJ's analysis at step three of the [SEP], the reasoning in

---

[11] The fact that Plaintiff did not take any psychiatric medications (<u>see</u> Tr. 1088), did not attend therapy or receive inpatient mental treatment (<u>see</u> <u>id.</u>), and only complained of depression at one treatment visit of record (<u>see</u> Tr. 588) necessarily limited the ALJ's ability to cite to evidence in the record inconsistent with Dr. Hunt's opinions.

34

those opinions applies with equal force to the RFC
assessment [the p]laintiff challenges here. Notably, in
McCartney, the Fourth Circuit expressly affirmed the
district court's ruling that an ALJ need only review
medical evidence once in his decision.  Similarly,
although the district court in Kiernan held that there is
no requirement that the ALJ rehash his prior discussion
of the claimant's medical evidence in his [s]tep [three]
analysis, the holding's supporting logic — i.e., that an
ALJ's discussion at one step can bolster the analysis at
another — applies readily here.

John R. v. Kijakazi, No. 2:22CV47, 2023 WL 2682358, at *4
(E.D. Va. Mar. 29, 2023) (unpublished) (internal quotation
marks, brackets, and citations omitted); see also Akinyele C.
v. Kijakazi, No. 4:22CV62, 2023 WL 3539431, at *5 n.7 (E.D.
Va. May 18, 2023) (unpublished) ("[T]he ALJ's decision must
also be read and considered in its entirety.  The ALJ's
supportability and consistency analysis follows from the ALJ's
earlier, more fulsome discussion of these same issues."
(internal citation omitted)).

In light of the foregoing analysis, the ALJ did not err
in discounting the opinions of Dr. Hunt, and Plaintiff's
second and final assignment of error thus provides no basis
for relief.

35

### III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 29, 2024